# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

GREAT AMERICAN INSURANCE
COMPANY, et al.,

        Plaintiffs,

      v.                             C-1-05-205

UNITED STATES OF AMERICA, et al.,

        Defendants.

## ORDER

This matter is before the Court upon defendant United States of America's motion for summary judgment (doc. 46), defendant United States Army Corps of Engineers' unopposed motion for judgment on the pleadings (doc. 52), and plaintiffs' motion to strike motion for summary judgment (doc. 55).  The parties have filed proposed findings of facts and conclusions of law, which the opposing side has highlighted as true, false or irrelevant.  Doc. 56, attach. 1, doc. 64, doc. 65.

## I.  Procedural and Factual History

Plaintiffs Great American Insurance Co., Fireman's Fund Insurance Co., and Indemnity Insurance Co. of North America filed this Admiralty action against defendants United States of America Army Corps of Engineer ("the Corps") and the United States of America ("United States") on March 7, 2005 (doc. 1).  The action arises under the Suits in Admiralty Act, 46 App. U.S.C. § 741, et seq., and general maritime law.

-1-

The incident giving rise to this lawsuit occurred on or about May 1, 2004.  On that date, the M/V L. Fiore, a commercial inland towing vessel operated by Madison Coal & Supply Company, Inc. ("Madison Coal"), was traveling down the Ohio river with a fifteen barge tow. While attempting to traverse the navigable pass of Lock & Dam 52, Barge OR5301 allided with the submerged pier of Lock & Dam 52 .  As a result of the allision,[1] the barge sustained severe damage and sank.  Barge OR4938 also sustained severe damage as a result of the allision. Pursuant to contracts of insurance, plaintiffs paid damages and expenses related to salvage and loss of use sustained by the barge owner, Ingram Barge Company ("Ingram"), for which Madison Coal was contractually and/or legally obligated to compensate the barge owner. Plaintiffs claim that they are subrogated to the rights and interests of Madison Coal and Ingram for the damages, which total $1,179,066.39.

Plaintiffs bring claims for negligence (Count One) and negligence per se (Count Two), arising from defendants' alleged failure to place and maintain buoys and to comply with all applicable rules and regulation to assure the safety of vessels passing through the area under their control.

## II.  Motion for Partial Judgment on the Pleadings/Summary Judgment against the Corps

The United States, on behalf of itself and the Corps, has filed a motion for judgment on the pleadings or, in the alternative, for summary judgment dismissing all claims against the Corps.  The motion is unopposed and is well-taken.  Accordingly, the motion is granted and the Corps is dismissed as a party to this suit.

---

[1]  An accident between a stationary object and a moving vessel is typically called an "allision" instead of a collision in admiralty cases.

### III.  Motion to Strike

Plaintiffs move to strike defendant United States' Motion for Summary Judgment on the ground that it was not timely filed.  Plaintiffs correctly note that pursuant to the Court's Scheduling Order entered on March 2, 2006, the deadline for filing dispositive pretrial motions was August 8, 2006 (doc. 19); although the discovery deadline was subsequently extended to October 15, 2007, defendant did not file its motion for summary judgment until December 17, 2007, which was one and one-half months after that deadline; and defendant did not seek leave of court to file its motion past the filing deadline.  Plaintiffs allege that defendant's delay in filing its motion hampers their ability to efficiently prepare for trial.  In the event the Court declines to strike the summary judgment motion, plaintiffs move the Court to continue the deadline for submitting the joint final pretrial order and continue the final pretrial conference and the trial of this matter.

The Court will deny the motion to strike.  While defendant should have moved to extend the dispositive motion deadline, striking the motion is not an appropriate sanction for defendant's failure to do so under the circumstances of this case.  Defendant did not act in bad faith but rather filed the motion shortly after the extended discovery deadline had passed.  Moreover, plaintiffs have not shown that they have been prejudiced by defendant's filing the motion past the dispositive motion deadline.  To the contrary, plaintiffs filed a response to the motion the day after they filed their motion to strike.  The Court therefore has the opportunity to resolve the summary judgment motion prior to the trial.  In addition, the parties have submitted a joint final pretrial order.  Because plaintiffs have not been prejudiced by defendant's delay in filing the Motion for Summary Judgment, the Court will consider the motion.

## IV.  Motion for Summary Judgment

Defendant United States moves for summary judgment on the ground that there is no genuine issue of material fact as to the cause of the allision, but instead the undisputed facts show that the vessel master's negligence was the sole cause of the grounding and that no agency or employee of the United States violated any duty to the vessel.

## V.  Undisputed Facts

The following facts are undisputed:

1.    The M/V L. Fiore is a 4,000 horsepower twin-screw river tug designed to push barges on the western rivers of the United States.  It is 164-feet long with a 40-foot beam.

2.    Madison Coal was the owner of the tug.

3.    Plaintiffs Great American Insurance Co., Fireman's Fund Insurance Co., and Indemnity Insurance Co. of North America were at all relevant times the marine insurers providing protection and indemnity insurance coverage to Madison Coal.

4.    Defendant United States was at all relevant times the owner and operator of Lock and Dam 52 ("Lock 52"), which is located at Ohio River mile 938.9.

5.    The M/V L. Fiori left Pittsburgh in April 2004 and headed down the Ohio River. At all relevant times, the tug was traveling downbound on the Ohio River.

6.    The tug was under the command of Captain Paul Randolph.  At all relevant times, he was on watch and in command of the tug.

7.    Terry McNickle served as the M/V L. Fiore's pilot.

8.    En route down the Ohio River, the M/V. L. Fiore embarked Captain Louis "Ed"
      Harris, who had retired from Madison Coal in 1995, as a posted pilot due to his
      experience and knowledge of the Ohio River in the vicinity of Lock 52 as neither
      Randolph nor McNickle had taken a tug and tow as far down the Ohio River as
      Lock 52.  Harris did not possess any authority over the navigation of the vessel.

9.    On May 1, 2004, the tug was equipped with a variety of navigational aids
      including, but not limited to, Ohio river chart books, two radars whose displays
      included "range rings," three radios, binoculars, a swing meter indicating the
      radial motion of the tow, and a computerized river chart system known as
      RiverPro on the bridge that was equipped with a display.

10.   Among the chart books the M/V L. Fiore carried was the booklet of Navigation
      Charts for the Ohio River published by the Corps.

11.   On May 1, 2004, the river gauge at Lock 52 was 24.6 feet.  At this river stage,
      Lock 52 was completely submerged, including the center pier and the lock wall.

12.   When Lock 52 is underwater, it is necessary for vessels to traverse the navigable
      pass, which is 1,248 feet wide.  The right descending limit of the navigable pass is
      the lock wall, marked in high water by green/black buoys and lighted "swing
      arms" which protrude well above the water.  The left descending limit of the
      navigable pass is the mid-river cement center pier, which is to be marked by a red
      buoy that is chained in such a way so as to float when the river water rises.  The
      water depth through the navigable pass is at least 21 feet.

13.   In addition to the red buoy on the center pier, the Coast Guard also maintains two red buoys which are aligned with the center pier, one situated approximately 1800 feet upstream of the pier and one located approximately 2000 feet downstream of the pier.

14.   It is not uncommon, especially in high water conditions, for buoys at Lock 52 to go missing.  The red buoy on the center pier is carried away six or seven times a year.  A stock of three or four replacement red buoys is maintained at Lock 52.

15.   At daybreak on Tuesday, April 27, 2004, four days before the allision, the red buoy on the center pier was reported missing.

16.   A red buoy was never replaced on the center pier itself.  Rather, three or four days after the buoy went missing, on April 27, 2004, lock personnel positioned a red buoy upriver from the center pier.  Estimates regarding the actual placement of the buoy upriver of the pier range from 200 feet above the pier to a distance approximately half-way between the Irvin Cobb Bridge, which is upriver of the lock, and the center pier.

17.   By May 1, 2004, the two red buoys maintained by the Coast Guard were missing.

18.   Lock 52 is manned 24 hours a day, seven days a week, by one of four shift leaders who stand 12-hour watches.

19.   Lock Operator Clabe Pressly was on watch at the time of the allision.  He had relieved Lock Operator Gary Proper before 7:00 p.m. on the evening of May 1, 2004.  He did not look for or observe the red buoy at any time during his shift prior to the allision.

20. The United States did not issue any written or verbal warnings or statements advising mariners navigating in the immediate vicinity of Lock 52 that the buoys, including the buoy required to be attached to the center pier, were missing and, therefore, that the left descending limit of the navigable pass and the submerged center pier were not marked in any way.

21. There was no written schedule for the inspection of the buoys.

22. If a visual inspection of the buoys was conducted, lock personnel did not record the inspection and/or the findings of the inspection.

23. It is industry custom for the Captain to use his eyesight, radar and experience when determining the vessel's lateral position in the river.  Lateral positioning is generally judged from the position of the riverbanks.

24. It is not customary in the inland river towing industry to "take fixes," "take ranges," "mark arcs," or "triangulate" distances as is done in the Navy.

25. Prior to May 1, 2004, Randolph and McNickle had spoken with a number of inland river pilots familiar with the Ohio River in the vicinity of Lock 52 in order to better understand and map out how to navigate the area.

26. The M/V L. Fiore left Paducah on the evening of May 1.  McNickle and Harris were in the pilothouse with Randolph.  Randolph remained in control of the vessel. The tug's tow was comprised of 15 barges, five long and three wide.  The overall length from the bow of the tow to the stern was 1,154 feet.  The width of the tow was 105 feet.

27. Randolph made a radio security call as the vessel departed Paducah.  He also "called traffic" at the Irvin Cobb Bridge.

28.     The M/V L. Fiore approached the Irvin Cobb Bridge and Lock 52 just before 7:00 p.m.  It was still daylight.  The tug was traveling at approximately six miles per hour.  The chart book was open to the appropriate chart and the RiverPro system was operating.  In addition, Randolph was monitoring and using the radio.

29.     Thereafter, Randolph radioed Lock 52 with a description of his tow.  Lock 52 responded, providing Randolph with the river gauge and advising that the lock was underwater, requiring the tug to use the navigable pass.  Lock personnel also advised Randolph that two boats were below the lock.

30.     Lock personnel did not advise Randolph that the red buoys marking the center pier were missing or provide any advice or guidance regarding how to run the navigable pass.

31.     Following the radio communications with Lock 52, Randolph radioed one of the boats below the lock, the M/V Joanne, and made passing arrangements.

32.     During the radio communications with the M/V Joanne, Randolph was steering across the river toward the Illinois side and the navigable pass.  At the same time, the three men in the pilothouse looked with their binoculars for the red buoy marking Lock 52's center pier.  No red buoys were observed.

33.     Randolph radioed the M/V Joanne a second time to inquire whether the captain of the M/V Joanne, Captain Art Snodgrass, could locate the red buoys.  Snodgrass responded and confirmed that no red buoys were present.

34.     Lock Operator Pressley, who was unaware of the missing buoy, overheard this radio communication.  He did nothing to confirm its veracity or to warn/instruct the M/V L. Fiore on how to proceed.

-8-

35.     Randolph positioned the M/V L. Fiore to make the navigable pass. Those in the
        pilothouse were watching the RiverPro system.

36.     At approximately 7:10 p.m., the port string of the tug's flotilla hit Lock 52's
        center pier.  The lead barge, which was loaded with steel pipe, sank and the barge
        behind it was damaged as a result of the allision.

## VI.  Applicable Law

### A.  Standard of Review

Fed. R. Civ. P. 56 allows summary judgment to secure a just and efficient determination
of an action.  This Court may grant summary judgment as a matter of law only when the moving
party has identified, as its basis for the motion, an absence of any genuine issue of material fact.
*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The party opposing a properly supported motion for summary judgment "may not rest
upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing
that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)
(quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253 (1968)).  The evidence of
the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor.
*Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970)).
However, a district court need not view the facts in the light most favorable to the nonmoving
party if that party's version of events is "blatantly contradicted by the record, so that no
reasonable jury could believe it . . ." *Scott v. Harris*, __ U.S. __, 127 S. Ct. 1769, 1776 (2007).

The court is not to weigh the evidence and determine the truth of the matter but is to
decide whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  There is no genuine
issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return

a verdict for that party. *Id.* at 249 (citing *Cities Serv.*, 391 U.S. at 288-289). If the evidence is merely colorable, *Dombrowski v. Eastland,* 387 U.S. 82, 84 (1967), or is not significantly probative, *Cities Serv.*, 391 U.S. at 290, judgment may be granted. *Anderson*, 477 U.S. at 249.

## B. Admiralty Law

To establish a negligence claim under admiralty law, plaintiff must show (1) there was a duty owed to plaintiff by the defendant; (2) the defendant breached that duty; and (3) the breach caused the plaintiff's alleged injuries. *Vinson v. Cobb,* 501 F.Supp.2d 1125, 1131 (E.D. Tenn. 2007) (citing *In Re Mid-S. Towing Co.,* 418 F.3d 526, 531 (5th Cir. 2005)). Admiralty law imposes a duty of care on vessel owners and operators to operate their vessels under the "rule of good seamanship" and in a safe and seaworthy manner. *Id.* (citing Thomas J. Schoenbaum, ADMIRALTY AND MARITIME LAW 760-64; 33 U.S.C. § 20082(c); *Belden v. Chase,* 150 U.S. 674, 698 (1893)).

Admiralty law recognizes several rebuttable presumptions. Among these is the "*Pennsylvania* Rule," which is a presumption of causation. *Id.* Under the *Pennsylvania* presumption, one who violates a statutory rule intended to prevent collisions is presumed to be the contributing, if not the sole, cause of the incident. *Caravel/Woodwind Charters, Inc. v. Tahoe Keys Marina, LLC,* 2008 WL 109093, *7 (E.D. Cal.) (citations omitted). That party bears the burden of showing "not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been." *Vinson,* 501 F.Supp.2d at 1131 (citing *The Pennsylvania,* 19 Wall. 125, 86 U.S. 125, 136 (1873)).

The "*Oregon* Rule" is a presumption of liability or fault. It holds that if a moving vessel collides with a stationary object, such as a dock or a navigational aid, the moving vessel is presumed to be at fault. *Id.* (citing *The Oregon*, 158 U.S. 186, 192 (1895). The burdens of

production and persuasion shift to the moving vessel, and the defendant is presumed liable unless he or she produces a preponderance of evidence showing the moving vessel acted with reasonable care, the allision was the stationary object's fault or resulted from an 'inevitable accident.'" *Id.* The *Oregon* presumption is based on "the common-sense observation that moving vessels do not usually collide with stationary objects unless the vessel is mishandled in some way." *Id.* at 1132 (citing *Folkstone Maritime Ltd. v. CSX Corp.*, 64 F.3d 1037, 1046 (7th Cir.1995) (quoting *Wardell v. Nat'l Transp. Safety Bd.*, 884 F.2d 510, 512 (9th Cir. 1989)).

"In admiralty, this presumption does more than merely require the ship to go forward and produce some evidence on the presumptive matter. The moving vessel must show that it was without fault or that the collision was occasioned by fault of the stationary object or was the result of inevitable accident." *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 795 (5th Cir. 1977) (citing *Patterson Terminals, Inc. v. S/S Johannes Frans*, 209 F.Supp. 705, 707 (E.D.Pa.1962) (citing *Carr v. Hermosa Amusement Corp., Ltd.*, 137 F.2d 983, 985 (9th Cir. 1943)). The vessel "must exhaust every reasonable possibility which the circumstances admit and show that in each [it] did all that reasonable care required." *Id.* (citing *Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co.*, 377 F.2d 724, 726 (5th Cir. 1967).

The *Oregon* presumption does not eliminate the need for the plaintiff to prove the general elements of negligence but instead simply satisfies the plaintiff's prima facie case. *Vinson*, 501 F.Supp.2d at 1132 (citing *Bunge*, 558 F.2d at 798; *Brown & Root*, 377 F.2d at 726). If a defendant comes forward with evidence to rebut the presumption, a court must consider such evidence since "[r]ebutting the presumption does not necessarily exonerate the [defendant's]

-11-

vessel from all liability." *Id.* (citing *City of Chicago v. M/V Morgan*, 375 F.3d 563, 573 (7th Cir. 2004)). Rather, admiralty law recognizes comparative fault. *Id*.

Courts have declined to apply the *Oregon* presumption in cases of allisions with sunken and hidden objects, noting that the presumption of negligence has been invoked "only against moving vessels which damaged wharves, moored vessels, and other stationary, visible objects." *See Delta Transload, Inc. v. Motor Vessel, Navios Commander*, 818 F.2d 445, 450 (5th Cir. 1987) (case remanded for specific findings regarding visibility of buoy "fouled by" defendant's vessel and knowledge of buoy's location by vessel's master and crew); *see also Pelican Marine Carriers, Inc. v. City of Tampa*, 791 F.Supp. 845, 852 (M.D. Fla.1992) (the presumption does not apply to allisions with sunken or hidden objects).

On the other hand, these same courts have determined that knowledge of an otherwise nonvisible object "warrants imposition of presumed negligence against the individuals operating the vessel who possessed this knowledge." The court in *Delta* found as follows:

> If the buoy's presence was known, the accident was neither fortuitous nor unavoidable; therefore, the rationale supporting the presumption would not be violated . . . At most, the master was aware that Delta employed a buoy system at this berth, but he had not been told of the buoy's location. To apply the presumption of negligence to the master and bow crew of the COMMANDER, the district court must find either that the buoy was visible or that these individuals otherwise possessed knowledge of its location. Because it is invoking the presumption, it is Delta's burden to prove either visibility or knowledge.

*Delta*, 818 F.2d at 450.

## VII. The Parties' Positions

Defendant argues that the M/V L. Fiore was solely at fault for the allision. Defendant contends that the *Oregon* Rule applies because the tug struck a stationary object, and the fact that the center pier was underwater does not effect the presumption. Rather, defendant claims that the

-12-

exact location of the pier was indicated in the chart book the tug carried, the tug could have judged the flotilla's passage by buoys and fixed marks on the lock wall on the Illinois side of the pass, Randolph did not exhaust every reasonable possibility to safely navigate the lock, and he failed to exercise reasonable care when he did not use tools at his ready command.  Moreover, defendant alleges that the crew's failure to use radar in navigating the flotilla violated Rule 7 of the Inland Rules of the Road, "Risk of Collision," 33 U.S.C. § 2007, and contributed to the cause of the allision, as did both Randolph's failure to look elsewhere when he discovered the buoy missing and Harris's alleged negligence in failing to instruct the crew on means of safely traversing the lock.

Defendant concedes that the Corps undertook a duty to establish a buoy on the center pier pursuant to 33 C.F.R. § 207.300(x)(1), which provides as follows:

> Whenever the river (guard) wall of the lock and any portion of the dam are awash, and until covered by a depth of water equal to the project depth, the limits of the navigable pass through the dam will be marked by buoys located at the upstream and downstream ends of the river (guard) wall, and by a single buoy over the end or ends of the portion or portions of the dam adjacent to the navigable pass over which project depth is not available. A red nun-type buoy will be used for such structures located on the left-hand side (facing downstream) of the river and a black can-type buoy for such structures located on the right-hand side. Buoys will be lighted, if practicable.

Defendant claims that its duty was satisfied when the buoy was attached to the pier.  Defendant contends that once its established this aid, its duty was that of a "Good Samaritan" as described by the Supreme Court in ***Indian Towing Co. v. United States***, 350 U.S. 61, 64-65 (1955), in which

-13-

the Court stated as follows:

> The Coast Guard need not undertake the lighthouse service.  But once it exercised its discretion to operate a light on Chandeleur Island and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning.

*Id*. at 69.  Defendant asserts that plaintiffs cannot show that the government's actions engendered reliance because the crew had actual knowledge of the absence of the buoy.  In addition, defendant argues that plaintiffs cannot meet their burden to show that the government failed to use due care in maintaining the buoyage because plaintiffs cannot prove that the buoy was gone for so long that the Lock Operator, in the exercise of due care, would have noticed it was missing.

Plaintiffs argue that the *Oregon* presumption does not apply in this case for two reasons.  First, the center pier was submerged and hidden from view at the time of the allision.  Second, the presumption does not apply where the stationary object was guilty of a statutory violation, but instead the *Pennsylvania* presumption applies in such a case and defendant must show that its fault could not have contributed to the allision.  Plaintiffs contend that defendant violated two regulations in this case:  33 C.F.R. § 207.300(x)(1) and Ohio River Division's Regulation 1130-2-23, ¶ 6, which provides that a "schedule will be established for inspection of areas and repairs to . . . buoys . . ." and that "[b]uoys will be used to delineate restricted areas upstream and downstream of the dams wherever practicable."  Plaintiffs argue that because defendant's motion for summary judgment relies on application of the *Oregon* presumption, the motion must fail.

Plaintiffs further argue that assuming the *Oregon* presumption applies, there are genuine issues of material fact as to whether the allision was the fault of a stationary object, namely, the center pier, so as to rebut the presumption.  Plaintiffs allege that the alleged statutory violations

-14-

cited above establish the fault of the center pier in causing and/or contributing to the allision. Second, plaintiffs allege that the presumption is rebutted because the tug and its crew acted with reasonable care by undertaking various measures to avoid the unmarked center pier.

In addition, plaintiffs argue that defendant was negligent per se or, stated otherwise, that the ***Pennsylvania*** presumption applies and there is no evidence that the statutory and regulatory violations referenced above could not have caused the allision.  Plaintiffs argue these violations require a finding in their favor or, in the alternative, establish genuine issues of material fact that compel denial of the motion for summary judgment.

Finally, plaintiffs agree with defendant that the Corps undertook a duty to maintain a red buoy affixed to the center pier pursuant to 33 C.F.R. § 207.300(x)(1) and that once it undertook this duty, it was obligated under ***Indian Towing*** to exercise due care in ensuring the buoy remained in good working condition.  Plaintiffs argue that the Corps engendered reliance by the crew of the M/V L. Fiore on the presence of the red buoy, which was reasonable and justified, and the Corps failed to exercise due care in the placement, inspection and maintenance of the buoy.

In reply, defendant acknowledges that the ***Oregon*** presumption does not apply to allisions with sunken or hidden objects but contends that the exception does not hold where those operating the vessel had knowledge of an otherwise nonvisible object at the time of the allision.  Defendant asserts that Captain Randolph knew of the existence of the center pier and its exact location was indicated in the chart book that the tug carried. Defendant further alleges that the temporary deficiency of the missing buoy neither creates nor negate presumptions - rather, the regulation requiring the placement of the buoy simply triggers the ***Indian Towing*** duty of due care, which defendant did not violate in this case.  In addition, defendant argues that there is no general rule of maritime law imposing negligence per se as a result of a statutory violation, except in the Jones

-15-

Act context. Finally, defendant argues that the violation of Ohio River Division's Regulation 1130-2-23 is immaterial because the red buoy on the center pier is plainly visible from the station from the which the Lock Operator communicates by radio and updates his computerized logs, so that no inspection schedule is necessary. Therefore, "the red buoy's presence is one of many details observed by the Lock Operator more frequently than any inspection schedule could practically require." In any event, defendant contends that any violation of a duty to inspect the buoy to verify its presence is superseded by Randolph's recognition of the fact that the buoy was missing.

### VIII. Opinion

A determination as to whether either the ***Pennsylvania*** or ***Oregon*** presumption applies in this case and, if so, whether the presumption is rebutted by the evidence hinges on the resolution of genuine issues of material fact. These include issues as to how long the buoy was missing; when the buoy was discovered missing; the importance of the buoy to navigating the pass; whether the crew knew or should have known of the exact location of the center pier; whether the Corps engendered reliance by the crew of the M/V L. Fiore on the presence of the red buoy; whether the crew's reliance on the red buoy was reasonable and justified; what measures the crew should have taken to navigate the pass; and to what extent, if any, alleged statutory and regulatory violations caused and/or contributed to the allision. Further development of the record at trial is necessary before a determination can be made as to whether each party exercised reasonable care and the degree of fault, if any, each party bears for the allision and the resulting damages. Accordingly, summary judgment is not warranted.

-16-

### IX.  Conclusion

In accordance with the foregoing, defendants' motion for partial judgment on the pleadings (doc. 52) is **GRANTED.**  Defendant United States Army Corps of Engineers is **DISMISSED** from the lawsuit.  Plaintiffs' motion to strike defendant's motion for summary judgment (doc. 55) is **DENIED**.  Defendant's motion for summary judgment (doc. 46) is **DENIED**.  This case will proceed to trial on the claims against the United States.

**IT IS SO ORDERED.**

S/ Herman J. Weber
HERMAN J. WEBER, SENIOR JUDGE
UNITED STATES DISTRICT COURT