UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


| GREAT AMERICAN INSURANCE CO, ET AL., | CASE NO. 1:05CV205 |
| --- | --- |
| PLAINTIFFS | (HOGAN, M.J.) |
| VS. | |
| UNITED STATES OF AMERICA ARMY CORP. OF ENGINEERS, ET AL., DEFENDANTS | ORDER |

## I. INTRODUCTION

The action arises under the Suits in Admiralty Act, 46 U.S.C. § 30901, et. seq., and general maritime law. The Court has *in personam* jurisdiction over Defendant United States of America pursuant to the Suits in Admiralty Act, 46 U.S.C.. § 30901, et. seq. The jurisdiction of the Court is not disputed. The parties have consented to entry of final judgment by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

This case is before the Court following a three-day bench trial and on Plaintiff Great American Insurance Company, Fireman's Fund Insurance Company and Indemnity Insurance Company of North America's Proposed Findings of Fact and Conclusions of Law (Doc. 58), Defendant United States of America's Proposed Findings of Fact and Conclusions of Law (Doc. 59), and the record as a whole. The following decision contains findings of fact and conclusions of law as required under Fed. R. Civ. P. 52(a). The Court, having considered the pleadings filed by the parties, the evidence presented at trial, and the pre- and post-trial briefs of counsel, hereby enters the following Findings of Fact, Conclusions of Law, and Order. To the extent that the foregoing findings of fact should more properly be considered conclusions of law, and vice versa, they are hereby adopted as such. If a finding of fact or conclusion of law is pertinent to any determination other than that indicated by the heading under which it appears, it is deemed adopted as a finding of fact or conclusion of law applicable to such other determination or

determinations as may be appropriate.

## II. FINDINGS OF FACT

The Court makes the following findings of fact:

1.  The M/V L. Fiore is a 4,000 horsepower twin-screw river tug designed to push barges on the western rivers of the United States. It is 164-feet long with a 40- foot beam.
2.  Madison Coal was the owner of the tug.
3.  Plaintiffs Great American Insurance Co., Fireman's Fund Insurance Co., and Indemnity Insurance Co. of North America were at all relevant times the marine insurers providing protection and indemnity insurance coverage to Madison Coal.
4.  Defendant United States was at all relevant times the owner and operator of Lock and Dam 52 ("Lock 52"), which is located at Ohio River mile 938.9.
5.  The M/V L. Fiori left Pittsburgh in April 2004 and headed down the Ohio River. At all relevant times, the tug was traveling downbound on the Ohio River.
6.  The tug was under the command of Captain Paul Randolph. At all relevant times, he was on watch and in command of the tug.
7.  Terry McNickle served as the M/V L. Fiore's relief pilot.
8.  En route down the Ohio River, the M/V. L. Fiore embarked Captain Louis "Ed" Harris, who had retired from Madison Coal in 1995, as a posted pilot due to his experience and knowledge of the Ohio River in the vicinity of Lock 52, as neither Randolph nor McNickle had taken a tug and tow as far down the Ohio River as Lock 52. Harris did not possess any authority over the navigation of the vessel.
9.  On May 1, 2004, the tug was equipped with a variety of navigational aids including, but not limited to, Ohio river chart books, two radars whose displays included "range rings," three radios, binoculars, a swing meter indicating the radial motion of the tow, and a computerized river chart system known as RiverPro on the bridge that was equipped with a display.
10. Among the chart books the M/V L. Fiore carried was the booklet of Navigation Charts for the Ohio River published by the Corps.

11. On May 1, 2004, the river gauge at Lock 52 was 24.6 feet. At this river stage, Lock 52 was completely submerged, including the center pier and the lock wall.

12. When Lock 52 is underwater, it is necessary for vessels to traverse the navigable pass, which is 1,248 feet wide. The right descending limit of the navigable pass is the lock wall, marked in high water by green/black buoys and lighted "swing arms" which protrude well above the water. The left descending limit of the navigable pass is the mid-river cement center pier, which is to be marked by a red buoy that is chained in such a way so as to float when the river water rises. The water depth through the navigable pass is at least 21 feet.

13. In addition to the red buoy on the center pier, the Coast Guard maintains two red buoys which are aligned with the center pier, one situated approximately 1800 feet upstream of the pier and one located approximately 2000 feet downstream of the pier.

14. It is not uncommon, especially in high water conditions, for buoys at Lock 52 to be missing. The red buoy on the center pier is carried away six or seven times a year. A stock of three or four replacement red buoys is maintained at Lock 52.

15. At daybreak on Tuesday, April 27, 2004, four days before the allision, the red buoy on the center pier was reported missing.

16. A red buoy was never replaced on the center pier itself. Rather, three or four days after the buoy went missing, on April 27, 2004, lock personnel positioned a red buoy upriver from the center pier. Estimates regarding the actual placement of the buoy upriver of the pier range from 200 feet above the pier to a distance approximately half-way between the Irvin Cobb Bridge, which is upriver of the lock, and the center pier.

17. By May 1, 2004, the two red buoys maintained by the Coast Guard were missing.

18. Lock 52 is manned 24 hours a day, seven days a week, by one of four shift leaders who stand 12-hour watches.

19. Lock Operator Clabe Presley was on watch at the time of the allision. He had relieved Lock Operator Gary Proper before 7:00 p.m. on the evening of May 1, 2004. He did not look for or observe the red buoy at any time during his shift prior to the allision.

20. The United States did not issue any written or verbal warnings or statements advising mariners navigating in the immediate vicinity of Lock 52 that the buoys, including the buoy

required to be attached to the center pier, were missing and, therefore, that the left descending limit of the navigable pass and the submerged center pier were not marked in any way.

21.  There was no written schedule for the inspection of the buoys.

22.  If a visual inspection of the buoys was conducted, lock personnel did not record the inspection and/or the findings of the inspection.

23.  It is industry custom for the Captain to use his eyesight, radar and experience when determining the vessel's lateral position in the river. Lateral positioning is generally judged from the position of the riverbanks.

24.  It is not customary in the inland river towing industry to "take fixes," "take ranges," "mark arcs," or "triangulate" distances as is done in the Navy.

25.  Prior to May 1, 2004, Randolph and McNickle had spoken with a number of inland river pilots familiar with the Ohio River in the vicinity of Lock 52 in order to better understand and map out how to navigate the area.

26.  The M/V L. Fiore left Paducah on the evening of May 1. McNickle and Harris were in the pilothouse with Randolph. Randolph remained in control of the vessel. The tug's tow was comprised of 15 barges, five long and three wide. The overall length from the bow of the tow to the stern was 1,154 feet. The width of the tow was 105 feet.

27.  Randolph made a radio security call as the vessel departed Paducah. He also "called traffic" at the Irvin Cobb Bridge.

28.  The M/V L. Fiore approached the Irvin Cobb Bridge and Lock 52 just before 7:00 p.m. It was still daylight. The tug was traveling at approximately six miles per hour. The chart book was open to the appropriate chart and the RiverPro system was operating. In addition, Randolph was monitoring and using the radio.

29.  Thereafter, Randolph radioed Lock 52 with a description of his tow. Lock 52 responded, providing Randolph with the river gauge and advising that the lock was underwater, requiring the tug to use the navigable pass. Lock personnel also advised Randolph that two boats were below the lock.

30.  Lock personnel did not advise Randolph that the red buoys marking the center pier were missing or provide any advice or guidance regarding how to run the navigable pass.

4

31. Following the radio communications with Lock 52, Randolph radioed one of the boats below the lock, the M/V Joanne, and made passing arrangements.

32. During the radio communications with the M/V Joanne, Randolph was steering across the river toward the Illinois side and the navigable pass. At the same time, the three men in the pilothouse looked with their binoculars for the red buoy marking Lock 52's center pier. No red buoys were observed.

33. Randolph radioed the M/V Joanne a second time to inquire whether the captain of the M/V Joanne, Captain Art Snodgrass, could locate the red buoys. Snodgrass responded and confirmed that no red buoys were present.

34. Lock Operator Presley, who was unaware of the missing buoy, overheard this radio communication. He did nothing to confirm its veracity or to warn/instruct the M/V L. Fiore on how to proceed.

35. Randolph positioned the M/V L. Fiore to make the navigable pass. Those in the pilothouse were watching the RiverPro system.

36. At approximately 7:10 p.m., the port string of the tug's flotilla hit Lock 52's center pier. The lead barge, which was loaded with steel pipe, sank and the barge behind it was damaged as a result of the allision.

## III. CONCLUSIONS OF LAW

The case involved a collision, called an "allision" in admiralty law, between a tug boat pushing a 15-barge tow and the center pier of Lock 52 on the Ohio River near Brookport, Illinois. Because of high-water conditions on May 1, 2004, the date of the accident, the lock and dam were "awash," the nautical term for "under water." The left front barge, containing a load of steel pipe, sunk. Damages were stipulated to be $1,179,066.39, which was paid by the Plaintiff group of carriers. This suit was filed to seek reimbursement of the funds previously paid by the carriers under the policy. The Plaintiffs assert that the Army Corps of Engineers was negligent per se for failing to maintain a red nun-buoy on the center pier of the Lock. Defendant argues that whether or not the buoy was present, it was negligence for the pilot of the M/V L. Fiore to

fail to properly navigate the channel and avoid impact with the Lock's center pier.

The accident occurred on what is known as the "lower" Ohio River, that portion of the River between Louisville, Kentucky and Cairo, Illinois. Captain Paul Randolph was at the wheel of the M/V L. Fiore when the accident occurred at shortly after 7:00 in the evening. Captain Randolph had been a licensed pilot for 19 years, but had never piloted a tug and tow through Lock 52 and was therefore not "posted" on that particular portion of the Ohio River. Therefore Madison Coal Co., the owner of the M/V L. Fiore and the insured under the Great American policy, retained Captain Ed Harris, a person with 53 years of experience on the River and a pilot for 35 of those years, and therefore a "posted" pilot on the lower portion of the Ohio River, to advise Captain Randolph on the recommended procedure to navigate the tug and tow through the unfamiliar Lock. The relief pilot, Terry McNickle, was also present in the wheelhouse when the accident occurred.

Manning the Lock and Dam was Clabe Presley, who began his employment with the Army Corps. of Engineers in 1999 as a Lock Operator and was promoted to Shift Supervisor in 2001. Presley was in charge of the Lock and Dam when the accident occurred. Presley admitted that the red nun-buoy, marking the center pier, was missing when the accident occurred, that Captain Randolph had phoned when the M/V L. Fiore had yet to cross the Irvin Cobb Bridge, and that he did not communicate to Captain Randolph that the red nun-buoy was missing.

33 C.F.R. § 2007.300 requires a submerged center pier to be marked with a red nun-buoy when the lock is awash. The trial testimony was unrebutted, and the parties stipulated, that at the time of the accident, there was no red nun-buoy over the center pier. The buoy in question had been missing since April 27, 2004. It is common knowledge that buoys become missing for a variety of reasons, none of which are the fault of either a boater or the Corps. Current, floating debris, broken cables and contact with other vessels and their wake sometimes dislodge buoys from their proper placement. However, despite what the layman's definition of fault might be, legal fault is mandated by 33 C.F.R. § 2007.300 when it is shown that the red nun-buoy is missing and some harm occurred because of it. Thus, we find that the Army Corps of Engineers was negligent per se.

A second basis for the Plaintiffs' claim that the Corps was negligent relates to the

opportunity Presley had to check for the presence of the red nun-buoy when he obtained knowledge of the approaching M/V L. Fiore and its tow. Government Exhibits 1E, 1F, 1G and 1J show that the presence or absence of the buoy could be seen by Mr. Presley at the time Captain Randolph notified him of the proximity of the M/V L. Fiore and its tow to the Lock. The notice was provided to Presley before the M/V L. Fiore reached the Irvin Cobb Bridge, which is approximately 1.25 miles from the Lock. Nevertheless, Presley never looked for the buoy and did not communicate to Captain Randolph that the red nun-buoy was missing. The significance of this is that Captain Randolph's planned procedure was to bring the M/V L. Fiore through the Kentucky span of the Irvin Cobb Bridge and then to steer to the right or starboard and cut across the river to the Illinois bank. The plan was then to use the red nun-buoy as a pivot point for beginning the turn left or to port in order to set up for passage through the navigable channel and to thereupon cross the I-24 Bridge, which is less than 2 miles down river or with the current. The choice to pass through the Kentucky span, rather than the Illinois span of the bridge was made because the Kentucky span is wider by 200 feet. When Captain Randolph learned that the buoy was missing, he did his best to bring the M/V L. Fiore and its tow into the proper position to navigate the channel. He missed by approximately 15 feet. To put distances into perspective, the tow consisted of 15 barges in 5 sets of 3 barges per set. The tow had a width of 105 feet and a length of approximately 1,000 feet. The navigable channel was 1,248 feet wide.

  Captain Randolph knew the width of the navigable channel as well as the width of his tow. He also knew the boundary marking the north side of the Lock because there were green buoys and lights on the swing arm located there. Because of the absence of the red nun-buoy, he did not know the precise location of the center pier and he received no advice or help from Presley as to how close to the north side boundary of the Lock the tow should pass. The Court does not regard Presley's failure to give this advice to be a negligent act on his part because Captain Randolph either knew or should have known how close was reasonable and would have the same information, relative to distances, as Presley. However, it certainly can be, and was, argued that Presley, had he looked, might have informed Randolph that the buoy was missing when he first learned of the approach of the M/V L. Fiore and that, had Randolph known earlier that the buoy was missing, he could have adjusted the pivot point backward and therefore

managed to bring the tow closer to the north wall of the Lock and avoid the accident. We regard the latter-described omission to be a second negligent act on the part of the Army Corps of Engineers. *See Indian Towing v. United States*, 350 U.S. 61 (1955).

To Plaintiffs' dual claim of negligence on the part of the Corps, the Defendant argues that it, as the sovereign, cannot be sued because it has not waived its sovereign immunity. Defendant argues that the waiver of sovereign immunity contained in the Federal Tort Claims Act, does not apply to "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government." 28 U.S.C. § 2680(a). Plaintiffs argue that its claim of negligence per se for failure to maintain a red nun-buoy over the center pier of the Lock involves no discretionary function as the duty is mandated by 33 C.F.R. § 2007.300. We agree with Plaintiffs' argument in this respect. Plaintiffs also argue that, while the omission on the part of Presley to inform Captain Randolph that the red nun-buoy was missing did involve an element of discretion, *In Re Ohio River Disaster Litigation*, 862 F.2d 1237 (6th Cir. 1989) stands for the proposition that decisions not involving any consideration of public policy are not within the discretionary function exception to the Federal Tort Claims Act. We find that Presley's omission was operational negligence and did not involve any consideration of public policy. Therefore, the discretionary exception does not apply to Presley's omission

Defendant argues that the statutory violation should be excused because there is no proof as to how long the red nun-buoy had been missing before the allision. This Court regards this argument to be specious. The time to specifically look for the buoy is when one has notice of the approach of the flotilla, even if a prior inspection 5 minutes previously showed the buoy to be properly placed.

The third claim advanced by Plaintiffs is that the Corps violated Paragraph 6(b) of Regulation 1130-2-23 by failing to establish a schedule for the inspection of buoys. The cited regulation also says that "[i]nspection frequency will be dictated by local conditions with due respect for the degree of use being experienced." Although the evidence clearly established that there was no written schedule, Lockmaster Ron Hall's expectations were that his staff would check for missing buoys at least 2 times per shift. It is doubtful that this "expectation" was

8

adequately communicated to Clabe Presley, but in any event, one would think that the time to check was dictated not so much by a schedule, but at a time when the person in charge of the Lock knew that a tug and tow was approaching. We regard the subject of a schedule dependent upon local conditions to be discretionary and within the discretionary function exception to the Federal Tort Claims Act. Even if this conclusion were to be erroneous, the failure to adopt a schedule for inspection of buoys could not be a proximate cause of the accident. Plaintiffs' third negligence claim is, therefore, decided in favor of Defendant.

Plaintiffs assert that since a violation of a regulation intended to prevent collisions or allisions and thereby promote public safety occurred, the burden shifts to Defendant to prove that the Corps' regulatory violation could not have been a cause of the allision. This is referred to as the "Pennsylvania Rule." Irrespective of which party has the burden of proof, it is obvious to this Court that the Corp's negligence in failing to maintain the red nun-buoy and its failure to notify the M/V L. Fiore of its absence, was a proximate cause of the damages sustained by Madison Coal and by virtue of contractual provisions, its insurers, the Plaintiffs in this case, whether the "Pennsylvania rule" or the "Oregon rule" applies. The real question is if, and to what extent, any arguable negligence of Captain Randolph and/or Captain Harris contributed. For the Court's analysis of this question, one must read on.

Captain Harris was hired to accompany the crew of the M/V L. Fiore on this trip from Pittsburgh down the Ohio River. We do not recall the destination, but do recall that it was past Paducah, Kentucky, where the M/V L. Fiore traded tows with another vessel on May 1, 2004 and obviously, Lock 52, which is located near Brookport, Illinois. Harris had previously worked for Madison Coal and was an experienced pilot, who was "posted" on the lower Ohio. His job was to advise Captain Randolph on the recommended way to approach Lock 52 and the I-24 Bridge to follow. The evidence was that both Harris and Terry McNickle, the relief pilot, as well as Captain Randolph, all in the wheelhouse at the time of the allision, were using binoculars and attempting to find the red nun-buoy as the M/V L. Fiore approached the pivot point. Defendant argues that Harris was negligent in relying upon the presence of the red nun-buoy and in putting excessive emphasis on using the buoy as a pivot point, when he should have foreseen a circumstance where the buoy was not there, and in being silent when he knew that the M/V L.

Fiore was too far away from the north wall of the Lock as the M/V L. Fiore approached. Plaintiffs deny any negligence on the part of Harris because Randolph was the pilot in command and free to accept or reject any advice from Harris. In addition, Plaintiffs say that Harris was an independent contractor and his negligence, if any, cannot be attributed to them via Madison Coal.

The width of the tow was 105 feet and the width of the navigable channel was 1,248 feet. The distance between the Irvin Cobb Bridge and Lock 52 is slightly more than 1 mile. The speed of the M/V L. Fiore was approximately 6 miles per hour. The current was much greater on the Illinois side of the River than on the Kentucky side from which the M/V L. Fiore was approaching. The testimony indicated that the wheelhouse personnel, Randolph, Harris and McNickle, knew that the red nun-buoy was missing as soon as they crossed the Irvin Harris Bridge. At that point, the Corp. argues, "Plan B" should have been activated. Plaintiffs assert that it was too late to put in action an alternative plan. Defendant argues that the captain of the M/V L. Fiore should know that buoys can be dislodged and are not always where they are supposed to be.

Defendant's argument assumes that Captain Randolph should discover for himself whether or not the red nun-buoy was in place. The Court does not believe such an argument makes sense under basic negligence principles, nor does such a position promote the safe passage of persons or property on the River. Clearly, the plan to pivot the M/V L. Fiore, based on the presence of the buoy, was not illogical because the plan was recommended by Harris and was the result of a plan carefully formulated before the trip began. It is equally clear that Presley, from his seat before the radio, had a clear view of site where the buoy should have been and had the duty to inform Captain Randolph that the buoy was missing. Had Captain Randolph known that the buoy was missing when he called the Lock before the M/V L. Fiore reached the Irvin Cobb Bridge, undoubtedly "Plan B" would have been activated. It is also true that, had Captain Randolph inquired about the presence or absence of the buoy, "Plan B" would also have been activated. An alternate plan could have been to make a more aggressive turn to starboard after passing under the bridge or mooring above the bridge until the buoy was replaced. The Court finds however, that in the absence of such a communication, Captain Randolph had the right to assume that the law would be followed and that the buoy was in place. *See Afran Transport Co.*

*v. U.S.*, 435 F.2d 213 (2d Cir. 1970). We do not find any actionable negligence on the part of Captain Randolph.

Captain Randolph was using his vision, aided by binoculars, his river charts and a swing meter in positioning the flotilla for the passage through the navigable channel. He was not using either radar or RiverPro. He had also rejected a plan to use the "sailing line" a passage through the Lock recommended by the Corps of Engineers. We do not regard his failure to use radar or follow the "sailing line" to be evidence of a lack of due care on his part. Captain Randolph was an experienced pilot attempting to factor the size and weight of his tow, the power and speed of his tug, the current and wind conditions in positioning the flotilla for a safe passage through the channel. Had the buoys been where they should have been or had he been told at an earlier point that they were missing, he could have and would have adjusted his pivot point and the allision would never had occurred. The two channel buoys, placed both before and after passage through the Lock, were the responsibility of the Coast Guard and Plaintiffs have made no claim against the Coast Guard. However, the upstream channel buoy would have been of considerable assistance to Captain Randolf had it been present. We do not know whether or not Presley could see the upstream channel buoy from his position at the radio. But if he could, we would find that it was a negligent act not to inform the M/V L. Fiore that the upstream channel buoy was missing.

We return now to the question of the arguable negligence on the part of Captain Harris for his failure to be more assertive in suggesting that Randolph maneuver the M/V L. Fiore closer to the north wall of the Lock. The evidence showed that Harris offered no advice after the trip plan was formulated even though he was present and in the wheelhouse when the pivotal maneuver was being made in the absence of the buoy. The contractual duty of Harris was to properly advise Captain Randolph about the best manner in which to approach Lock 52 after traversing the Irvin Cobb Bridge. Harris may well have breached his duty to Madison Coal, but his duty did not extend to the Corps. Therefore, we find that the arguable negligence of Harris could not serve as a proximate cause of the allision.

Plaintiffs, perhaps fearing that the Court might find negligence on the part of Harris, argue that the legal status of Harris was that of an independent contractor, rather than an

11

employee. Although not material to our decision, we find that Harris was in a voluntary, rather than compulsory pilotage relationship with Madison Coal and that therefore, he was an employee, rather than an independent contractor. *See* Alex L. Parks, *The Law of Tug, Tow and Pilotage*, 1030-31 (2nd ed. 1082); *Homer Ramsdell Transp. Co. v. LaCompagnie Generale Transatlantique,* 182 U.S. 406 (1901). While the arguable negligence or breach of contract of Harris is attributable to Madison Coal, it did not, as we have said, extend to the Corps. Moreover, even if extended, said negligence or breach could not serve as a proximate cause of the allision because Randolph was still the pilot and the captain in command of the boat.

Two channel buoys were placed at what we shall call entrance and exit points to the lock by the Coast Guard. One was placed 1,800 feet above the Lock and the other, 2,000 feet below the Lock. Ron Hall, the Lockmaster, was not on duty at the time of the accident, but he testified that his expectation was that when any buoy was noticed missing, the lock operator was to notify mariners and the Coast Guard by radio. Presley did not fulfill Hall's expectations. When no one in the wheelhouse of the M/V L. Fiore could locate any of the buoys, Captain Randolph radioed the M/V Joanne, which was parked below the Lock and headed up river. Captain Snodgrass, the skipper of the M/V Joanne, replied that all the buoys were gone. Presley monitored the call, but chose to remain silent. This arguable negligent act on the part of Presley could not serve as a proximate cause of the accident because by this time, it was too late to alter the course and the M/V L. Fiore was in the process of making its turn to port.

Two expert witnesses were called by the parties to voice their opinions. Captain Sam Schropp testified on behalf of the Plaintiffs. Captain Schropp serves as a marine consultant, having formed Schropp Marine Consulting LLC in 2004. Captain Schropp began his career as a deckhand during the mid 1970s and after working for a number of companies and acquiring various licenses, began a 15-year career with Ingram Barge Company in Paducah where he pushed tows of 15 to 30 barges and weights up to 40, 000 tons. Captain Schropp opined that the accident would have been prevented had the M/V L. Fiore made a more aggressive turn to starboard after crossing the Irvin Cobb Bridge, that Captain Randolph exercised reasonable care under the circumstances and that the absence of the buoy when the M/V L. Fiore was within three quarters of a mile from the Lock put the vessel in "extremis."

12

Captain Richard Frenzel was called by Defendant. Although Captain Frenzel has spent more than 45 years in the marine industry, the bulk of his experience was as a marine surveyor. Captain Frenzel has had some experience operating tug boats, but he also operated passenger vessels. In any event, Captain Frenzel does not possess a license that would enable him to operate a flotilla, such as was involved in the instant case, through Lock 52 and hadn't operated through Lock 52 in the last 15 years. Captain Frenzel's opinion was that Randolph should have relied less on his eyesight and more on his radar and RiverPro. Randolph previously had testified that the RiverPro, a scrolling chart of the river, was at the end and that the screen was blank. Randolph also indicated that his radar would have been ineffective because it would not have shown a submerged pier in the absence of a buoy. We respect the opinion of Captain Frenzel, but believe it to be overly critical. We also believe said opinion to be in the nature of 20/20 hindsight, rather than appreciating the time, speed and distance factors that impacted Randolph's judgment call at the time.

In conclusion, we find: (1) that in failing to maintain the red nun-buoy affixed to the center pier, the Defendant was negligent per se; (2) that Clabe Presley was negligent in failing to observe and report to Captain Randolph that the red nun-buoy was missing at the time when Presley first learned of the approach of the tug and tow; (3) that Clabe Presley's failure to instruct Captain Randolph to maintain a constant distance of 500 feet from the north side of the navigable pass was not a negligent act; (4) that Defendant's failure to have, and maintain, a schedule for buoy inspections is a discretionary act not subject to question by either Plaintiffs or this Court; (5) that Presley's failure to report the missing buoy immediately after he monitored the radio communication between the M/V L. Fiore and the M/V Joanne could not have been a proximate cause of the allision because it was, at that point, too late for the M/V L. Fiore to make a more aggressive turn to starboard; (6) that the arguable negligence of Captain Harris in failing to communicate to Captain Randolph that Randolph should make a more aggressive turn to starboard is a matter between Madison Coal and Captain Harris and did not serve as a proximate cause of the allision; (7) that Captain Randolph exercised due care and was free from negligence, contributory or otherwise; (8) that the negligence described in (1) and (2) above was the proximate cause of the allision; and (9) that the stipulated damages are $1,179,066.39.

Prevailing counsel should present a Judgment Entry on or before September 1, 2008.

IT IS SO ORDERED.

August 15, 2008

_____
Timothy S. Hogan
United States Magistrate Judge


J:\HOGANTS\lfiore2.wpd